Matthews Roderick BOUDREAUX,
Appellant,

v.

The STATE of Texas, Appellee.

No. 09–93–083 CR.

Court of Appeals of Texas,
Beaumont.

Submitted May 13, 1994.

Decided June 29, 1994.

Douglas M. Barlow, Beaumont, for appellant.

Tom Maness, Dist. Atty., Rodney D. Conerly, Asst. Dist. Atty., Beaumont, for state.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

Appellant was found guilty by a jury of the felony offense of Murder. Appellant elected to have the trial court assess punishment. Punishment was assessed at confinement for life in the Institutional Division of the Texas Department of Criminal Justice. Appellant presents three issues for consideration on appeal, *viz:*

Point of Error One: The evidence was insufficient to support the conviction.

Point of Error Two: Reversible error occurred when the prosecution failed to produce an exculpatory photograph, State's Exhibit 35, until after appellant had testified.

Point of Error Three: Reversible error occurred when a witness stated an opinion that appellant's brother was of the opinion that appellant was guilty.

Appellant's initial point of error does not argue that a specific element of the alleged offense was not proven by the State. Instead, appellant argues as follows:

As set out in appellant's pointed motion for an instructed verdict, appellant urges that the evidence is insufficient to support a conviction of murder. There was no credible eyewitness to the offense. The testimony of children of such tender age cannot be considered sufficient, especially considering the contradictory nature of the testimony and admitted statements by the family of the deceased which may have influenced said testimony.

In evaluating the sufficiency of the evidence, appellate courts must review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Geesa v. State,* 820 S.W.2d 154 (Tex. Crim.App.1991). This standard of review is the same for both direct and circumstantial evidence cases. *Geesa,* 820 S.W.2d at 158–162. The record before us indicates that the State's case was almost entirely circumstantial. Through its initial witnesses, the State established that, immediately prior to her death, the victim, Linda Willis, was reconciling with her estranged husband and ending the relationship she had with appellant. The State also established that the relationship between appellant and the victim was a very stormy one involving physical violence and heated verbal confrontations between the two. Several witnesses placed appellant's vehicle at the victim's apartment complex

between the hours of 11:00 p.m. and 2:00 a.m. on the night of the murder. One witness, Lawrence Thomas, was a neighbor of appellant. Thomas testified that at approximately 1:00 a.m. on the night of the murder he was walking through the complex to his apartment. The direct examination of Thomas continued as follows:

Q. (the State) Did you—did you used to see his (appellant's) car parked in that spot or near that spot very often?

A. (Lawrence Thomas) Yes, sir, when he was out there.

Q. Had you seen him out there before?

A. Yes, sir.

Q. Do you know Matthews Boudreaux?

A. Yes, sir.

(Witness identifies appellant for the record.)

Q. Did you get along with Matthews Boudreaux?

A. Yes, sir.

Q. Did you ever have any problems with him?

A. No, sir.

Q. Did y'all talk?

A. Yes, sir.

Q. And what did y'all talk about?

A. Speak about every day things. You know, just talk.

Q. Uh-huh. Would y'all—would you characterize your relationship with him as being friendly or unfriendly?

A. Friendly.

Q. Now, do you know whether or not he saw Linda Willis?

A. Yes, sir.

Q. Did he?

A. Well, I can't quite say. I heard him at the house when I came through there that night.

Q. And were you able to recognize his voice?

A. Yes, sir.

Q. Did you hear him at the house often?

A. Yes, sir.

Q. If you were in your apartment and there were voices coming from Linda Willis' apartment, would you know if one of those voices was Matthews Boudreaux's?

A. Yes, sir.

Q. Did you hear him in that apartment very often?

A. Yes, sir.

Q. Did you hear him arguing with Linda Willis very often?

A. Yes, sir.

Q. Now, let's go back to February 2nd of 1992. You said you came in and walked past the parking lot. You saw your car that night and did you also see Matthews Boudreaux's car that night?

A. That was my brother's car, not mine.

Q. I'm sorry. Your brother's car.

A. Yes, sir.

Q. And did you also see Matthews Boudreaux's car that night?

A. Yes, sir.

Q. Now, about what time in the evening was it?

A. About 1:00. It was about 7 after 1.

Q. Okay. Did you walk past Linda Willis' apartment to go up to your apartment?

A. Yes, sir.

Q. When you walked past, did you hear any noise coming out of her apartment?

A. Yes, sir.

Q. What did you hear?

A. Tell her to stop crying, be quiet. Sounded like stuff was moving in the house.

Q. Okay. Did you hear Matthews Boudreaux's voice saying those things?

A. Yes, sir.

Q. And where—was he being loud?

A. Yes, sir.

Q. And what exactly, that you can remember, was he saying? What was he saying to her?

A. Just telling her to shut up, be quiet, stop crying.

Q. Did you hear any sounds consistent with some kind of physical fight?

A. Sounded like furniture or something was moving.

Q. Did you ever hear anyone scream or tell someone to stop?

A. Yes, sir.

Q. Okay. Do you know—

A. She said stop.

Q. "She" being Linda Willis?

A. Yes, sir.

Q. Did you call the police?

A. No, sir.

Q. Why didn't you call the police?

A. Wasn't nothing unusual.

Q. What about it wasn't unusual?

A. The arguing and fighting.

■ Christopher Thomas, Lawrence's brother, testified that he lived in the same apartment with Lawrence, and that on the night in question, he observed appellant's car parked in the parking lot at approximately 2:30 a.m. Christopher also stated that he had observed the victim and appellant arguing the day before the murder.

Ostensibly, the crux of appellant's complaint under his first point of error focuses on the testimony of two of the victim's children, six-year-old Nikita Willis and eight-year-old Jermaine Willis. Nikita and Jermaine were present in the apartment along with two younger siblings when their mother was murdered. Although the testimony of both children was at times difficult to follow and at certain points clearly contradictory, nevertheless both children placed appellant inside the apartment arguing with the victim. Apparently the children had awakened at some point while asleep in their bedroom. They discovered the door to their bedroom closed. Because the doorknob was broken off, Jermaine had to use a makeshift tool to open the door. As the children emerged from the bedroom, Jermaine testified that he observed appellant run out of the apartment. Nikita testified that at some point she looked out of a window and saw appellant getting into his car. The children then discovered the partially clad body of their mother lying on the sofa in the living room. The four children then exited the apartment and walked a short distance to their aunt's apartment within the same complex.

The aunt, Jacqueline Bevel, testified next. A brief, but we feel, compelling piece of testimony was elicited from her as follows:

Q. (the State) What was their—well, when you first saw them, did it startle you?

A. (Ms. Bevel) Yes, it did for the four kids to be there by themselves knocking at the door at that time, and they were all crying.

Q. Were they emotionally—I gather by the fact that they were crying, they appeared to be emotionally distraught?

A. Yes, sir.

Q. Would you describe that as being a little bit or a lot?

A. A lot. They were all—all four of them were crying and they were all talking at one time, saying that their mother was dead.

Q. Okay. Now, considering their emotional condition, I guess it would be safe to say that they were like you said all talking, they all had a lot to say?

A. Yes, sir. I had to try and calm them down because I was trying to figure out what they was (sic) all saying.

Q. Okay. Were they very excited in what they were trying to tell you?

A. Yes, sir.

Q. Could you tell us the nature of what it was they were telling you?

A. They were telling me that their mother was laying on the couch and that she was dead. And I was asking them, what do you mean she's dead. I mean, where's your mother? And I didn't believe it until I went there with them. I didn't know what was going on, but I knew something was wrong for the kids to be there by theirselves (sic).

Q. Also in that excited condition, were they giving you any indication as to who the person was that killed her?

(DEFENSE COUNSEL): Your Honor, I'll object to that, it calls for hearsay.

THE COURT: Overruled.

Q. Go ahead.

A. Yes, sir. They said that—they call him Big Matt—said that he was there earlier that night after their father had left.

As alluded to previously, appellant attacks the credibility of the evidence, not its sufficiency. Specifically, appellant takes issue with the "testimony of children of such tender age."[1] However, it is axiomatic that the fact finder, as the exclusive judge of the facts, the witnesses' credibility, and the weight given their testimony, is free to believe or disbelieve the testimony of any witness. *Flanagan v. State*, 675 S.W.2d 734, 746 (Tex.Crim.App.1984) (opinion on rehearing). The trier of fact may reconcile conflicts in the testimony and accept or reject any or all of the evidence on either side. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim. App.1992). The fact finder need not believe even uncontroverted testimony. *See Johnson v. State*, 571 S.W.2d 170, 173 (Tex.Crim. App.1978). The fact finder may also draw reasonable inferences and make reasonable deductions from the evidence. *Benavides v. State*, 763 S.W.2d 587, 588–589 (Tex.App.— Corpus Christi 1988, pet. ref'd). Furthermore, the mere fact that the eye-witness testimony is elicited from children under the age of fourteen is of no relevance to this Court when reviewing the *sufficiency* of the evidence. *Karnes v. State*, 873 S.W.2d 92, 96 (Tex.App.—Dallas 1994, n.w.h.). The cases cited by appellant as authority are inappropriate because they either are 1) pre-*Geesa* cases employing the now-defunct "alternate reasonable hypothesis" analytical construct, or 2) have been expressly disavowed by *Matson v. State*, 819 S.W.2d 839, 842–843 (Tex. Crim.App.1991). After a careful review of all of the evidence in the light most favorable to the verdict, we find that any rational trier of fact could have found each of the alleged elements of the offense proven beyond a reasonable doubt. Point of error one is overruled.

Appellant's argument under his second point of error is somewhat puzzling and quite unique. As we appreciate his complaint it is that the State failed to produce an allegedly exculpatory photograph of appellant purportedly showing the lack of scratches on his face and neck in violation of a discovery motion previously granted by the trial court. The unique portion of this complaint stems from the argument that appellant was forced to take the witness stand so that Defendant's Exhibit H, a facial photograph of appellant previously inadmissible because of a predicate defect, could be admitted upon appellant's proper authentication testimony. Thereafter, during its cross-examination of appellant, the State produced State's Exhibit 35, the alleged exculpatory photograph, and admitted said exhibit into evidence. What is curious about appellant's complaint of being forced to testify in order to have Defendant's Exhibit H admitted is that appellant's trial counsel was the photographer. The Rules of Evidence do not appear to bar appellant's trial counsel from having become a witness and testified as to the time, place, and circumstances surrounding the production of Exhibit H thus satisfying the predicate for its admissibility. Furthermore, appellant made no objection to the trial court when State's Exhibit 35 was produced or tendered for admission. Nevertheless, we will address appellant's claim of a violation of TEX.CODE CRIM.PROC.ANN. art. 39.14 (Vernon 1979).[2]

Article 39.14 provides, *inter alia*, that upon motion of a defendant and showing of good cause, the trial court may order the State to produce for inspection a variety of documents, including photographs, "which

---

1. The record before us reflects that at no time did appellant object to the children's competence to testify, nor has appellant raised competency as a point of error on appeal. The children's testimonial competency, therefore, has not been preserved for any sort of appellate review. TEX. R.APP.P. 52(a); *Grayson v. State*, 786 S.W.2d 504, 505 (Tex.App.—Dallas 1990, no pet.).

2. Appellant also complains of violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. Appellant, however, fails to "carefully separate federal and state issues into separate grounds and provide substantive analysis or argument on each separate ground." *Heitman v. State*, 815 S.W.2d 681, 690–691, n. .23 (Tex.Crim.App.1991). We therefore decline to address the federal constitutional claims as they have been inadequately briefed.

constitute or contain evidence material to any matter involved in the action...." Furthermore, under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a prosecutor has an affirmative duty to turn over material, exculpatory evidence. In the instant case, appellant's alleged need for State's Exhibit 35 was for impeachment purposes in that police witnesses testified that appellant appeared to have scratches on his face when he arrived at the police station on the morning that the murder was discovered. Impeachment evidence is included within the scope of the term "exculpatory evidence." *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Evidence withheld by a prosecutor is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Id.* at 682, 105 S.Ct. at 3383–84, 87 L.Ed.2d at 494. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* The defendant bears the burden of showing materiality. *Amos v. State*, 819 S.W.2d 156, 159–160 (Tex.Crim.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1959, 118 L.Ed.2d 561 (1992). In determining materiality, the reviewing court is to evaluate the undisclosed evidence in the context of the entire record. *Turpin v. State*, 606 S.W.2d 907, 916 (Tex.Crim.App.1980).

In the instant case, we find appellant has failed to meet his burden of showing "materiality," i.e., a reasonable probability of acquittal if State's Exhibit 35 had been provided prior to appellant taking the witness stand. A glaring problem facing appellant in this regard stems from the fact that State's Exhibit 35 is not exculpatory in light of the testimony of Port Arthur Police investigators. Identification Technician Larry Nickelson testified that the victim's fingernail clippings were preserved for DNA analysis should they contain any residual skin from the perpetrator. When asked if "they" were successful in matching anyone, Nickelson replied, "No, sir." Furthermore, direct examination of the lead detective, Robert Whitesel, produced the following exchange:

    Q. (the State) When you were talking with the defendant, Matthews Roderick Boudreaux, did you notice anything about him, marks or anything of that sort about him that caused you any concern?

    A. (Whitesel) Yes. He had, I believe some scrape marks on his right cheek, I believe right around here somewhere.

    Q. And that wasn't necessarily conclusive though, was it?

    A. No, sir.

    Q. In fact the victim's fingernails, were they actually taken as evidence?

    A. Yes, sir, they were.

    Q. Were they submitted to the Jefferson County Regional Crime Lab?

    A. Yes, sir, they were.

    Q. Those were also tested for DNA analysis to see if there was anything under them, weren't they?

    A. Yes, sir.

    Q. Any success with that?

    A. No, sir.

The record also reflects that Detective Eddie Collins testified on cross-examination that he observed "marks" on the *left* side of appellant's face. It is clear to us that without State's Exhibit 35, and prior to appellant having taken the witness stand, the State's police witnesses had already been impeached on the issue of scratches on appellant's face. The State itself made the presence of scratches on appellant's face a non-issue in its questioning of both I.D. Technician Nickelson and Detective Whitesel with regard to the DNA results. All of this is to say that we find no reasonable probability that the late disclosure of State's Exhibit 35 affected the outcome of appellant's trial taken in context of the entire record. From the record before us, it was apparently not necessary for appellant to have taken the witness stand in order to address the "scratches" issue. We find no merit in appellant's complaint under point of error two and it is overruled.

Appellant's final point of error complaining of improper opinion testimony by a State's witness directs our attention to appellant's trial objection as follows:

    (Defense Counsel): Your Honor, I object, that's also Rule 403, it should be stricken.

THE COURT: Sustain the objection.

(Defense Counsel): I ask the jury be instructed to disregard.

THE COURT: Jury disregard the last comment by this witness.

(Defense Counsel): I also ask for a mistrial at this point.

THE COURT: I'll take it under advisement and let you know tomorrow.[3]

 Appellant's objection at trial was based solely on Tex.R.Crim.Evid. 403 which provides that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. *Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App.1991) (opinion on rehearing), is the controlling authority in this area. The trial court in the instant case apparently found the testimony to be more prejudicial than probative and sustained appellant's objection and promptly instructed the jury to disregard the witness's statement. In his brief, appellant's argument focuses solely on the fact that the type of statement elicited by the State in the instant proceeding has traditionally been inadmissible, with all of his supporting case authorities decided prior to the effective date of the Rules of Criminal Evidence.

 At any rate, appellant's argument and authorities miss the issue under point of error three. The trial court has already agreed that the statement in question was inadmissible. The question before us at this point is whether the trial court committed any error in refusing to grant appellant's motion for mistrial. As to that issue, appellant's brief is completely silent. An appellate brief that cites no authority in support of the issue before the reviewing court will not be addressed as said issue is considered inadequately briefed. *Vuong v. State*, 830 S.W.2d 929, 940 (Tex.Crim.App.), *cert. denied,* — U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); Tex.R.App.P. 74(f). Point of error three is overruled; the judgment and the sentence of the trial court are affirmed.

AFFIRMED.

---

3. The record reflects that the trial court later denied appellant's motion for mistrial.