TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-97-00249-CR






Patrick Smith, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT


NO. 96-4011, HONORABLE JON WISSER, JUDGE PRESIDING







 Appellant Patrick Smith was convicted of the murder of his wife, Amanda Smith
("decedent"). See Tex. Penal Code Ann. § 19.02(b)(1) (West 1994). The trial judge sentenced him to
forty years' confinement in the Texas Department of Criminal Justice Institutional Division. On appeal
Smith asserts four points of error complaining of the sufficiency of the evidence and the admission of certain
testimony. We will affirm the trial court's judgment.


FACTUAL AND PROCEDURAL BACKGROUND

 Decedent met Patrick Smith in the spring of 1994. Their relationship was a tumultuous one. 
On June 18, 1994, on complaint by decedent, appellant was arrested for assault with injury. Nonetheless,
the two were married on July 21, 1994. Appellant pleaded guilty to the assault charge on October 21,
1994. In September and October of 1994, Amanda Smith called the Center for Battered Women for
assistance several times and was admitted to the center's shelter for two weeks in October 1994, but by
November was back together with appellant. On January 2, 1995, police were called to a family
disturbance at the grocery store where decedent worked, but she did not want to file charges against
appellant because he was already on probation from the earlier assault. By February 8, appellant began
living with Pontia Holder, whom he later referred to as his girlfriend. (1) On April 15, Amanda Smith was
found dead in her apartment, the result of an intraoral gunshot wound. Patrick Smith contended that he and
decedent were having sex when decedent shot herself. Though no blood was seen on him, appellant's
hands did bear gunshot residue.

 Later that day, appellant signed a seven-page statement at the police station describing the
events leading up to the time of the shooting, in which he stated the following (2): On Thursday, April 13th,
appellant went to decedent's apartment. At the time, appellant was living with his girlfriend Pontia Holder. 
While at decedent's apartment, appellant and decedent began kissing and having sex. The two started to
have anal sex, but decedent asked appellant to stop because it was hurting her. Appellant told decedent
that having anal sex meant a lot to him "as making true love"; he did not just want to have sex with her, but
wanted to make love with her because she was his wife. Appellant told decedent that if they terminated
their relationship over anal sex, then he might as well go kill himself because he would be totally alone
without her. Decedent then said, "I got a great idea. Let's make it a double suicide. . . . It would have to
be done at the same time. If you just killed yourself I don't know if I would have the courage to kill
myself." She asked if appellant still had his gun. Appellant told her it was in the pawn shop and he did not
have enough money to retrieve it. Decedent said she had money in the bank and if appellant would come
back later on Friday (it was early morning on Friday by this time), she would give him the money to go get
the gun. Appellant eventually agreed and left to pick up Pontia from work.

 At about 11:00 a.m. Friday, appellant returned to decedent's apartment and the two left
for the bank. Appellant described in detail how he and decedent engaged in a variety of sexual activities
while waiting at the drive-up window at the bank. They returned to the apartment with the money for the
gun, continuing in their sexual exploits. By 1:30 p.m., appellant left and returned to his home. Two hours
later, he and Pontia went to the pawn shop, redeemed the gun, and returned to their home. At 10:25 p.m.,
appellant took Pontia to work and then went to decedent's apartment.

 Decedent asked if he had brought the gun. Appellant said yes but that he needed to show
her how to clean the weapon because if his fingerprints were on the gun, "'they're going to think it was a
suicide/murder rather than a joint suicide.' I told her I did not want to be labeled a murderer
posthumously." After cleaning the gun, appellant fell asleep until 2:45 a.m. After waking, appellant showed
decedent how to lock and load the gun, which she did. Decedent began pointing the weapon around. 
Because she enjoyed playing with guns during sex, according to appellant, he was not worried yet. 
Decedent said she was afraid of the pain of being shot, but appellant told her she would be dead before
she even heard anything. Appellant stated he still did not believe she was serious. They began having sex,
with decedent on her hands and knees and appellant behind her. Decedent put the gun in her mouth. 
According to appellant, she had done this before, so he was still not worried; it was a part of her "sexual
thrill game." After "major orgasms," appellant told her "we are all still alive." He then went to the living
room to watch television, but decedent stayed in the bed playing with the weapon. Watching her "mouth"
the gun excited him again so he returned to the bed.

 Appellant continued: "She took the weapon briefly out of her mouth and told me I did not
have my head in the right place. I asked, 'What do you mean?' She said, 'I thought we were going to get
two birds with one stone.' I said, 'What you have chambered is a Black Talon [bullet], which will take out
the insides of your head and the whole left side of my head.'"

 "I still didn't think she was serious. It just didn't click. She told me she wanted me to put
my head directly behind her head. I had the left side of my head against the right side of her head. I was
lying there, licking and kissing on her neck. I was looking down the right side of her face, looking at the
left side of the barrel. I continued to rub her hand, massage her breast and kiss her. I heard her sob and
I saw the muscle in her thumb tighten. Her body bucked and I heard the gunshot."

 "I pushed myself really hard off her. When I hit the floor I looked at her body lying there. 
I saw the death gasp. About the time her death gasp happened her body sagged and the blood came out. 
I said, 'Oh, my God, she's dead.' I called 911."

 Appellant also stated that decedent had called him in mid-March to tell him she had a
miscarriage and that she had tried to kill herself by taking some sleeping pills and vodka. Earlier in the
week of Amanda's death, appellant had been to her apartment and found a note that appeared to be a
suicide note with her parents' phone numbers on it. She had also threatened to shoot herself on February
8 after telling appellant she wanted a divorce.

 The medical technician who worked the night of the shooting testified that the gun was
located underneath decedent's body, which was face down on the bed. An officer at the scene testified
that appellant had wild mood swings as he told the officer what had happened, at times crying and sobbing
and at other times laughing. At one point, appellant tried to pick a fight in the parking lot with a passerby
who was apparently trying to see what was happening. While still at the scene, appellant's hands were
"rubbed" as part of an atomic absorption test for gunshot residue. Residue was found on both his and
decedent's hands.

 Appellant was eventually indicted for murder, manslaughter, and assisted suicide. Rejecting
appellant's story that he did not intentionally or knowingly cause the death, the jury returned a verdict of
guilty on the murder charge. Appellant asserts four points of error on appeal.


DISCUSSION

Sufficiency of the Evidence

 In his first point of error, appellant asserts that the evidence is legally insufficient to support
the jury's verdict of murder. In reviewing the legal sufficiency of the evidence, we must determine whether,
viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S.
307, 309 (1979). Under the Jackson standard, the reviewing court is not to position itself as a thirteenth
juror in assessing the evidence nor is it our place to second guess the determination made by the trier of
fact. See Matchett v. State, 941 S.W.2d 922, 936 (Tex. Crim. App. 1996). The fact finder may also
draw reasonable inferences from the evidence presented. Boudreaux v. State, 878 S.W.2d 701, 705
(Tex. App.--Beaumont 1994, no pet.).

 Based on the indictment and the relevant statute, in order to convict appellant of murder
the State had to show that appellant intentionally or knowingly caused the death of Amanda Smith by
shooting her with a firearm. See Tex. Penal Code Ann. § 19.02(b) (West 1994). The State offered into
evidence appellant's statement to the police stating that although he was present at the time of the shooting,
he had not caused it. A Department of Public Safety forensic chemist testified regarding the results of
atomic absorption tests done on appellant's hands. He performed tests firing a weapon with two persons
holding the gun in various different positions. He testified that the test results were consistent with
appellant's having placed his hand over the shell-casing ejection port of the gun and his thumb on the
trigger. Gunshot residue was detected on one of decedent's hands, but it was found on both of appellant's
hands. The fact that the shell casing did not eject out of the ejection port when the gun was fired is
consistent with the scenario that appellant's hand was not only near but was actually on the gun, blocking
the ejection port. There was also a demonstration at trial that the gun could be fired by one person with
another person's hand on the weapon.

 The State presented evidence detailing the nature of the relationship between appellant and
decedent. There was testimony that appellant was extremely controlling and manipulative of decedent and
could make her do anything he wanted. The couple had been married for less than a year and had a very
rocky relationship. In his statement to police, appellant described how decedent had told him that she had
attempted suicide on March 16 or 17 by taking sleeping pills and vodka. He was allegedly concerned
about her and went to see her on March 19, but a police officer was there and arrested appellant for a prior
assault. Appellant told a friend that decedent had tricked him into coming over. He told the friend, "I'm
going to get that bitch for that one."

 Appellant was living with Pontia Holder at the time of Amanda's death. There was
testimony at trial that appellant had stated in late March that he wanted to end his relationship with decedent
so he could be with Pontia. Officer Mary Huske testified that Pontia had accused decedent of burglarizing
her car and that the two women were not on friendly terms. Appellant called the Austin Police Department
on March 21 and accused decedent of making harassing calls to Pontia. Appellant and Pontia Holder had
their phone blocked so decedent could not call them.

 Pontia told a friend that appellant was going to meet with Amanda on Friday, April 14 to
end his relationship with her. The day before the shooting, appellant told another friend he was going to
get his gun out of the pawn shop because Amanda was contemplating suicide and he was going to take the
gun to her. The friend stated that his impression was that appellant's relationship with Amanda would not
end unless one of them was dead.

 Appellant had been employed as a security guard and the evidence showed that he knew
how easy the trigger pull was on a Ruger 9mm, the gun used in the shooting. The evidence showed
appellant knew how to load the weapon in such a way that his fingerprints would not be on the gun. 
Neither appellant's nor decedent's fingerprints were found on the gun. There was testimony that appellant
was very concerned about his fingerprints being on the gun.

 One neighbor, two doors down from decedent's apartment, testified that the walls of the
apartments were thin and she heard a "boom" between 2:00 and 2:30 a.m. The adjoining neighbor testified
that she did not arrive at home until after 2:30 a.m. and that she did not hear any noise from decedent's
apartment although it was easy to hear sounds from the apartment. A firearms expert testified that the
gunshot would have been very loud. There was testimony that appellant did not call 911 until
approximately 3:45 a.m. Police officers and EMS personnel noticed that the decedent's blood had already
begun to dry, indicating the blood had been there for a while. From this evidence, it can be inferred that
appellant did not immediately call 911, but waited well over an hour before reporting the death.

 There was evidence that appellant tried to get decedent's life insurance beneficiary
information just hours after her death and that he was very angry when he could not get the information. 
He later found out that he was not the beneficiary. There was also evidence that appellant tried to gain
access to decedent's bank account information after her death and again became extremely angry and loud
when frustrated in this attempt.

 Dr. Richard Coons, a general and forensic psychiatrist who has extensive experience with
suicidal patients, testified that Amanda's actions and words in the days preceding her death were
inconsistent with someone contemplating suicide. He testified that men and women commit suicide in
different ways. Men tend to commit suicide more violently, while women tend to use more passive
methods. It would be very unusual for a woman to shoot herself with a gun. It would be unusual to get a
new job two days before committing suicide, as decedent had just done. It would be inconsistent for a
woman to have painted her fingernails, as decedent had done, just before killing herself, especially with a
firearm.

 When a deadly weapon such as a gun is pointed at a person, the jury can determine what
inference to draw concerning the accused's awareness of the risk, taking into account all of the surrounding
circumstances. See Thomas v. State, 699 S.W.2d 845, 850 (Tex. Crim. App. 1985); Giles v. State, 617
S.W.2d 690, 691 (Tex. Crim. App. 1981). The standard of review in determining the legal sufficiency of
the evidence is the same for both direct and circumstantial evidence. Geesa v. State, 820 S.W.2d 154,
162 (Tex. Crim. App. 1991). It is not necessary that every fact point directly and independently to
defendant's guilt; it is enough if the conclusion is warranted by the combined force of all the incriminating
circumstances. Banda v. State, 890 S.W.2d 42, 50 (Tex. Crim. App. 1994), cert. denied, 115 S. Ct.
2253 (1995). Viewing the evidence in the present case in the light most favorable to the prosecution, we
believe the jury could have rationally concluded that appellant either intentionally or knowingly caused
decedent's death. Point of error one is overruled.

 In his second point of error, appellant asserts that the evidence was factually insufficient to
sustain appellant's conviction for murder. In a factual-sufficiency review, the court reviews all the evidence
without the prism of "in the light most favorable to the prosecution"; the court may consider the testimony
of defense witnesses and the existence of alternative hypotheses. Stone v. State, 823 S.W.2d 375, 381
(Tex. App.--Austin 1992, pet. ref'd untimely filed). The court should set aside the verdict only if it so
contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Id.; see Clewis
v. State, 922 S.W.2d 126, 136 (Tex. Crim. App. 1996) (adopting the standard in Stone). The appellate
court reviews the evidence weighed by the jury that tends to prove the disputed facts and compares it to
evidence tending to disprove the disputed facts. Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim. App.
1996). The appellate court must be appropriately deferential so as to avoid substituting its own judgment
for that of the factfinder. Clewis, 922 S.W.2d at 133. The question is not whether the appellate court
thinks the jury made the correct decision, but whether the jury verdict was clearly wrong and unjust.

 Appellant elicited testimony from Dr. Robert Bayardo, the doctor who performed the
autopsy on decedent, that he originally ruled the death to be a suicide. However, in an amendment to the
original report, Dr. Bayardo wrote:


It is my opinion based on my experience, knowledge, and evidence obtained by scene
investigation and autopsy investigation that the decedent, Amanda Smith, came to her
death as result of a self-inflicted intraoral gunshot wound. However, the same evidence
cannot exonerate without a reasonable doubt the other party involved in this incident,
Patrick Dwayne Smith. It was possible for him to directly or indirectly pull the trigger of
the gun. Based on this assumption I hereby amend the manner of death to 'could not be
determined.'


Appellant also elicited testimony from Dr. Bayardo that he filed the amendment voluntarily. Bayardo stated
there was concern about insurance money the family might lose if the death was ruled a suicide, but he also
denied filing the amendment for that reason.

 Appellant points out that he was not seen with any blood on his hands or clothes. There
was testimony that if appellant had washed blood off of his hands, he would have also washed off the
gunshot residue that was found on them. However, Dr. Bayardo testified that it would be possible for a
person behind the victim to get no blood on them, especially because there was not much blood from the
back of decedent's head. Additionally, there was testimony that appellant was wearing different clothes
when police arrived than earlier in the evening.

 Even considering appellant's explanation of the events to the police, the testimony of Dr.
Bayardo that he originally ruled the death a suicide, and the lack of blood on appellant, we conclude that
the verdict is not so contrary to the great weight of the evidence as to be clearly wrong and unjust. Point
of error two is overruled.


Admission of Testimony

 In his next two points of error, appellant complains that the trial court improperly admitted
certain testimony. The trial court has discretion to allow or exclude evidence, because the trial judge is in
the superior position to evaluate the impact of the evidence. See Blakeney v. State, 911 S.W.2d 508, 513
(Tex. App.--Austin 1995, no pet.). An appellate court should not set aside the trial court's evidentiary
rulings unless the complaining party demonstrates an abuse of discretion. Id.

 In appellant's third point of error, he asserts the trial court erred in admitting the testimony
of Mike Shaw that Pontia Smith once wore a neck collar, that the collar meant she was appellant's slave,
and that appellant had Pontia read a book about women being slaves to men. Appellant also contends the
trial court erred in admitting testimony by Pontia Smith that she and appellant had a master/slave
relationship and that appellant had given her a book to read concerning women being slaves to men. 
Appellant further asserts the trial court erred in admitting the testimony of April Hague, his former girlfriend,
that appellant had asked her to call him "master" during sex, asked her to read a book about women being
slaves to men, enjoyed sex in public, tied her up during sex, and once slapped her for not calling him
"master" during sex. Appellant contends this evidence is not relevant, is inadmissible character evidence,
and the prejudicial value outweighs any probative value. See Tex. R. Evid. 401, 403, 404(b). (3) 

 Relevant evidence means evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more probable or less probable than it would be
without the evidence. Tex. R. Evid. 401. The evidence need not by itself prove or disprove a particular
fact to be relevant; it is sufficient that the evidence provides a small nudge in proving or disproving some
fact of consequence. Montgomery v, State, 810 S.W.2d 372, 376 (Tex. Crim. App. 1990). Relevancy
is not an inherent characteristic, but arises from the relation of the evidence to a matter properly provable
in the case. Blakeney, 911 S.W.2d at 513. Because reasonable persons may differ when determining
whether a particular inference arises from a piece of evidence, the appellate court will not reverse the trial
court's ruling as long as it is within the "zone of reasonable disagreement." Montgomery, 810 S.W.2d at
391; Blakeney, 911 S.W.2d at 513.

 The State argues that the testimony of Shaw, Smith, and Hague is relevant because it makes
more probable facts of consequence. First, the State maintains that the testimony tends to show intent by
demonstrating motive. Testimony concerning Pontia Smith's willingness to participate in a master/slave
relationship tends to show the motive that appellant killed decedent so he could be with someone who was
very willing to be his slave. Also, the State maintains all the testimony complained of tends to show
opportunity. The State contends this testimony shows that appellant dominates and controls the women
in his life. Arguably, because of this control and domination, it is more likely appellant was able to get
decedent to put a gun in her mouth, giving him the opportunity to kill her. We agree with the State and
conclude that the trial court did not abuse its discretion in admitting this evidence as relevant.

 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a
person in order to show that he acted in conformity therewith. Tex. R. Evid. 404(b). It may, however, be
admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,
identity, or absence of mistake or accident. Id. Evidence of the background in which events transpired
that is helpful for the jury to understand a particular transaction may be admitted. Blakeney, 911 S.W.2d
at 514.

 Appellant argues that the testimony of Shaw, Smith, and Hague merely shows appellant's
unsavory character and invited the jury to convict him for acting in conformity therewith. We disagree. In
Blakeney this Court concluded that appellant's admission of his sexual orientation was inadmissible as
background evidence because the inference that all homosexual men are molesters of little boys was
unsupported by evidence or logic. Blakeney, 911 S.W.2d at 515. However, we also concluded that
evidence appellant was sexually aroused while talking about the child victim had relevance apart from
character conformity because it could be viewed as implying that appellant had sexual attraction toward
the child and that he may have committed an act realizing that desire. Id.

 The State suggests several purposes other than character conformity for which this
testimony was presented. First, the State argues that the testimony demonstrates opportunity as described
above; that is, appellant's control and domination of women demonstrates how he obtained an opportunity
to kill Amanda Smith. The State next contends the testimony provides background evidence of the crime
scene. The State had presented as evidence a note found at the crime scene that read "take me, spank me,
master." No objection was made to admission of the note. The challenged testimony provided
background in explaining the presence of the note. Third, the State asserts that evidence of Pontia Smith's
master/slave relationship with appellant was admissible to show her bias in favor of appellant. In light of
the unique circumstances of this case, we conclude that the trial court did not abuse its discretion by
refusing to exclude this testimony as improper character evidence.

 Although relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. In balancing probative value and unfair
prejudice, the presumption is that the probative value will outweigh any prejudicial effect. Montgomery,
810 S.W.2d at 389; Blakeney, 911 S.W.2d at 515. Therefore, it is movant's burden to show that the
probative value is substantially outweighed by the danger of unfair prejudice.

 Appellant points out that evidence of sexually related misconduct has long been considered
inherently inflammatory because even if lawful, such practices are considered improper, immoral, and highly
offensive by segments of the population. See Bishop v. State, 869 S.W.2d 342, 346 (Tex. Crim. App.
1993). In Bishop, the evidence in question (defendant's girlfriend testified he required her to fondle herself
and that he was capable of performing sexually for extended period of time) was not particularly useful in
pinpointing appellant as the offender and was far less significant than other evidence already presented by
the State. Id. In contrast, the evidence in the present case of appellant's master/slave relationships was
a useful and important element in establishing the State's theory as to opportunity and intent. Further, our
review of the actual testimony at trial reveals that neither Shaw nor Pontia Smith testified about the sexual
nature of the master/slave relationship. While Hague's testimony did involve sexual aspects, those aspects
were not emphasized. Appellant has not demonstrated that the prejudicial effect of this evidence so
outweighed its probative value that the trial court abused its discretion. Point of error three is overruled.

 In his fourth point of error, appellant asserts that the trial court erred in admitting hearsay
evidence of decedent's statements to employees of the Center for Battered Women. Appellant complains
of statements made by (1) Sue Snyder, who performed an intake interview on the decedent, (2) Mary
Ermey, who conducted five or six counseling sessions with decedent, and (3) Kimberly Harlan, who took
a hotline call from decedent and arranged emergency housing for her.

 Hearsay evidence that consists of statements made for purposes of medical treatment and
diagnosis is admissible. See Tex. R. Evid. 803(4). Mary Ermey testified that she was a licensed master
social worker and licensed therapist. She testified that she performed assessments of women at the shelter
to assess their need for psychiatric care and counseling. This Court has upheld the admission of testimony
from licensed therapists pursuant to Rule of Evidence 803(4). See Zinger v. State, 899 S.W.2d 423, 431
(Tex. App.--Austin 1995), rev'd on other grounds, 932 S.W.2d 511 (Tex. Crim. App. 1996); Syndex
Corp. v. Dean, 820 S.W.2d 869, 873 (Tex. App.--Austin 1991, writ denied); Fleming v. State, 819
S.W.2d 237, 247 (Tex. App.--Austin 1991, pet. ref'd). The trial court did not abuse its discretion in
admitting this testimony. (4)

 Appellant further argues that the testimony of Snyder, Ermey, and Harlan was not
admissible because the probative value of the testimony was substantially outweighed by its prejudicial
value. See Tex. R. Evid. 403. Because an objection asserting prejudicial value was not asserted against
Harlan's testimony at trial, this objection was not preserved as to her testimony. See Tex. R. App. P.
33.1(a)(1)(A). However, objection as to prejudicial value was preserved as to the testimony of Ermey and
Snyder.

 The testimony by Ermey was extensive. She conducted five or six counseling sessions with
decedent. Ermey stated decedent felt unsafe with her husband, felt frightened, intimidated, degraded, and
overpowered by him, and also felt that appellant was controlling of her money. Ermey also described
yelling matches that decedent had detailed to her. In balancing probative value and unfair prejudice, the
presumption is that the probative value will outweigh any prejudicial effect. Montgomery, 810 S.W.2d
at 389; Blakeney, 911 S.W.2d at 515. The probative value here was the tendency to demonstrate the
degree of control and domination appellant had over decedent and the nature of their relationship that
would yield to appellant an opportunity to kill decedent. We conclude the trial court did not abuse its
discretion in admitting Ermey's testimony.

 Snyder testified at trial that she filled out the registration form when decedent was admitted
to the Center for Battered Women. At this point in the trial, there had already been evidence of decedent's
contacts with the center. Snyder testified that she did not have a recollection of decedent's demeanor at
the time she was admitted to the center. Snyder stated that she asked decedent the questions required by
the form and, without repeating what those questions were, that she concluded decedent met the criteria
for admittance. No cross-examination of Snyder was conducted. Appellant does not demonstrate how
any unfairly prejudicial effect of Snyder's minimal testimony at this point of the trial outweighed the
probative value of the testimony. Point of error four is overruled.


CONCLUSION

 The evidence presented at trial was legally and factually sufficient to support the jury's
verdict. The trial court did not abuse its discretion in admitting the complained-of evidence. Having
overruled appellants points of error, we affirm the trial court's judgment.



 J. Woodfin Jones, Justice

Before Chief Justice Yeakel, Justices Aboussie and Jones

Affirmed

Filed: June 25, 1998

Do Not Publish
1. Pontia Holder is now Pontia Smith, having married appellant about six weeks after Amanda Smith's
death.
2. The foregoing excerpts and summaries from appellant's statement are used as the primary basis of
our statement of the facts because, although exculpatory in part, they are the only comprehensive account
of the events leading up to the shooting. Other evidence that casts doubt on the veracity of portions of the
statement will be discussed in our review of the sufficiency of the evidence.
3. As to the particular testimony by April Hague that appellant like to have sex in public, appellant made
no timely objection when this testimony was elicited at trial. Error is therefore waived. Tex. R. App. P.
33.1(a)(1)(A). As to the testimony that appellant sometimes tied Hague up during sex, we find any error
is waived because evidence that appellant tied Pontia Smith up during sex had already been admitted and
is not presented as error before this Court. See Narvaiz v. State, 840 S.W.2d 415, 430 (Tex. Crim.
App. 1992) (error in admitting evidence is waived if evidence to the same effect is admitted at another point
in the trial).
4. Appellant also asserts that the trial court erred in admitting the testimony of Harlan and Snyder under
Rule of Evidence 803(4). Appellant did not raise an objection to this testimony under Rule 803(4) at trial,
so error has not been preserved on the issue. See Tex. R. App. P. 33.1(a)(1)(A); Reed v. State, 927
S.W.2d 289, 291 (Tex. App.--Fort Worth 1996, no pet.).



substantially outweighed by its prejudicial
value. See Tex. R. Evid. 403. Because an objection asserting prejudicial value was not asserted against
Harlan's testimony at trial, this objection was not preserved as to her testimony. See Tex. R. App. P.
33.1(a)(1)(A). However, objection as to prejudicial value was preserved as to the testimony of Ermey and
Snyder.

 The testimony by Ermey was extensive. She conducted five or six counseling sessions with
decedent. Ermey stated decedent felt unsafe with her husband, felt frightened, intimidated, degraded, and
overpowered by him, and also felt that appellant was controlling of her money. Ermey also described
yelling matches that decedent had detailed to her. In balancing probative value and unfair prejudice, the
presumption is that the probative value will outweigh any prejudicial effect. Montgomery, 810 S.W.2d
at 389; Blakeney, 911 S.W.2d at 515. The probative value here was the tendency to demonstrate the
degree of control and domination appellant had over decedent and the nature of their relationship that
would yield to appellant an opportunity to kill decedent. We conclude the trial court did not abuse its
discretion in admitting Ermey's testimony.

 Snyder testified at trial that she filled out the registration form when decedent was admitted
to the Center for Battered Women. At this point in the trial, there had already been evidence of decedent's
contacts with the center. Snyder testified that she did not have a recollection of decedent's demeanor at
the time she was admitted to the center. Snyder stated that she asked decedent the questions required by
the form and, without repeating what those questions were, that she concluded decedent met the criteria
for admittance. No cross-examination of Snyder was conducted. Appellant does not demonstrate how
any unfairly prejudicial effect of Snyder's minimal testimony at this point of the trial outweighed the
probative value of the testimony. Point of error four is overruled.


CONCLUSION

 The evidence presented at trial was legally and factually sufficient to support the jury's
verdict. The trial court did not abuse its discretion in admitting the complained-of evidence. Having
overruled appellants points of error, we affirm the trial court's judgment.